[Cite as *In re J.B.*, 2016-Ohio-2670.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY**

IN RE:

      J.B.,

CASE NO.  1-15-79

ADJUDICATED DEPENDENT CHILD.

[HAROLD B. - APPELLANT]

**O P I N I O N**

**Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2013JG30984**

**Judgment Affirmed**

**Date of Decision:  April 25, 2016**

**APPEARANCES:**

    *F. Stephen Chamberlain* **for Appellant**

    *Sarah N. Newland* **for Appellee**

**SHAW, P.J.**

{¶1} Father-appellant, Harold B. ("Harold"), brings this appeal from the November 17, 2015 judgment of the Allen County Common Pleas Court, Juvenile Division, awarding legal custody of his daughter J.B. to Joseph B., Harold's brother, and Julie J., Joseph's fiancé/long-term girlfriend.

*Relevant Facts and Procedural History*

{¶2} On July 23, 2013, Logan County Children Services ("LCCS") filed a complaint in the Logan County Common Pleas Court, Juvenile Division, alleging that J.B. was a dependent, neglected, and abused child. The complaint indicated that J.B., who was born in January of 2001, had called 911 alleging that her father, Harold, had sexual intercourse with her approximately 3 days prior to the call. The complaint further alleged that "[t]he Agency received a referral approximately two (2) years ago with respect to the minor child alleging sexual abuse which was substantiated. However, there was insufficient evidence to prosecute the alleged perpetrator at that time." (Doc. No. 1). The complaint indicated that the whereabouts of J.B.'s mother, Stephanie S., were unknown. The complaint requested, *inter alia*, that the court grant temporary custody of J.B. to J.B.'s relatives, with LCCS being ordered protective supervision.

{¶3} The same day the complaint was filed, LCCS filed a motion for emergency temporary orders. The trial court held a hearing on the motion and

determined that Joseph B., J.B.'s paternal uncle, and Julie J., Joseph's fiancé, should be designated as temporary legal custodians of J.B. and that a restraining order should be issued against Harold. Harold did not object to the temporary orders and the emergency requests were granted. A Guardian ad Litem ("GAL") was appointed to represent J.B.'s interests and a case plan was also filed.

{¶4} On September 18, 2013, an adjudicatory hearing was held. At the hearing, Harold stipulated to the factual basis upon which J.B. could be adjudicated a dependent child pursuant to R.C. 2151.04(C) and in exchange for Harold admitting to the dependency allegation, LCCS dismissed the abuse and neglect allegations. The trial court specifically made note of the fact that Harold continued to "adamantly" deny the allegations of sexual abuse. Based on the agreement, J.B. was determined to be a dependent child as defined in R.C. 2151.04(C), and the remaining allegations were dismissed. Temporary orders were continued, and the matter was set for a dispositional hearing. On September 19, 2013, a judgment entry was filed memorializing these findings.

{¶5} On October 18, 2013, a dispositional hearing was held. At the dispositional hearing the trial court designated Joseph and Julie as temporary legal custodians of J.B. The order requiring that Harold be restrained from having any contact, direct or indirect, with J.B. was continued. The trial court also adopted an

amended case plan, set court-ordered protective supervision, and approved the report of J.B.'s GAL.

**{¶6}** On October 28, 2013, the case was transferred from the Logan County Common Pleas Court to the Allen County Common Pleas Court, Juvenile Division, due to the fact that J.B. was living with Joseph and Julie in Lima, in Allen County. Additionally, the record indicated that Harold had relocated to Delphos.

**{¶7}** The Allen County Common Pleas Court, Juvenile Division, accepted jurisdiction and appointed a new GAL for J.B. The trial court then conducted multiple review hearings, continuing Joseph and Julie's temporary legal custody of J.B. The trial court found in the judgment entries related to those hearings that the Allen County Children Services Board ("ACCSB") was making reasonable efforts to reunify J.B. and Harold.

**{¶8}** On April 15, 2014, J.B.'s mother, Stephanie S., filed a motion requesting supervised visitation with J.B. Stephanie indicated in her affidavit that Harold had been awarded custody of J.B. in 2007 and had denied her court-ordered visitation for the past 7 years. (Doc. No. 27).

**{¶9}** On June 3, 2014, Harold filed a motion to vacate the no-contact order that prevented him from seeing J.B. and a motion for visitation privileges. (Doc. No. 34).

{¶10} On October 23, 2014, J.B.'s new GAL filed a report indicating that J.B. wanted to remain in the custody of Joseph and Julia. The report also indicated that Harold had violated the no-contact order multiple times. (Doc. No. 54).

{¶11} On October 29, 2014, a hearing was held on Stephanie's motion for visitation, Harold's motion to vacate the no-contact order, and a motion filed by the ACCSB to extend temporary custody. (Doc. No. 70). At the hearing Harold admitted that he had violated the no-contact order multiple times and that he had taken pictures of J.B. from a distance. The GAL, speaking on J.B.'s behalf, indicated that J.B. was afraid of Harold and that she was fearful Harold would abduct her. Based on the evidence presented at the hearing the magistrate recommended that temporary legal custody be extended, that Harold should have no-contact by any means with J.B., and that Stephanie should be permitted supervised visitation with J.B.[1] (*Id.*) The magistrate's decision was reviewed and then adopted by the trial court.

{¶12} On December 15, 2015, the ACCSB filed a motion to modify Joseph and Julie's temporary legal custody of J.B. into legal custody. (Doc. No. 62). ACCSB also requested that the trial court terminate all court-ordered services by the ACCSB. (*Id.*) Harold opposed ACCSB's motion.

---

[1] According to the magistrate's decision, there was an agreement at the hearing for Stephanie to be permitted supervised visitation. However, we note that no transcript of this hearing, or any hearing aside from the final hearing on legal custody, was provided to this Court.

{¶13} On April 9, 2015, the GAL filed a final report detailing her involvement in the case and making her recommendation that legal custody of J.B. be granted to Joseph and Julie. (Doc. No. 81). The report indicated that the GAL had met with J.B. in late March of 2015 and that J.B. had expressed her desire not to live with Harold. The report also indicated that J.B. had bonded with Julie.

{¶14} On April 10, 2015, a hearing was held before the magistrate on the ACCSB's motion to modify the temporary custody arrangement and to terminate court-ordered supervision. At the hearing, six witnesses testified beginning with Megan Coffman, a caseworker with the ACCSB. Coffman detailed how her agency became involved with J.B., explaining that J.B. had made allegations of sexual assault against Harold and that J.B. had been adjudicated dependent by the Logan County Common Pleas Court. Coffman also testified that the investigation done by LCCS found that the sexual abuse allegation was "indicated." (Tr. at 8). In addition, Coffman testified that there was an investigation of Harold engaging in physical abuse of J.B., and that investigation determined that the allegation was "substantiated." (*Id.*) The allegation of physical abuse involved "marihuana that was found [in Harold's residence] during * * * a law enforcement search warrant that was accessible to [J.B.] in the home and [J.B.] had also stated that she knew that there was marihuana in the home and where it was." (*Id*. at 9).

{¶15} Coffman testified that Harold did submit to a psycho-sexual assessment per the case plan requirements, but there were some tests that could not be administered to Harold due to his level of cognition. In addition, there was a criminal case that was still being investigated in Logan County, so there were some areas that the doctor performing the examination could not explore. Coffman testified that she recommended Harold undertake parenting classes, which he did. Coffman also testified that she recommended Harold attend counseling and that Harold was in the process of contacting counselors.

{¶16} Despite Harold's compliance with some parts of his case plan, Coffman testified that Harold violated his no-contact order with J.B. four times and that J.B. was scared of Harold. Coffman testified that at one point Harold had made the comment that if he was going to kidnap J.B. he would take J.B. to Canada "because Canada does not extradite back to the United States for a kidnapping charge."[2] (Tr. at 14).

{¶17} Coffman testified that during the pendency of this case the no-contact order between J.B. and Harold had not been modified

> **because of the violations of the no-contact order as well as [J.B.] continuing to express * * * that she does not want to have contact with [Harold], does not want to see [Harold]. She has expressed that she is fearful of [Harold] that if she did see him or went back to live with him, she is fearful that he would yell at**

---

[2] We place this particular segment in quotations to emphasize that it is the caseworker's recitation of Harold's statement that Canada does not extradite to the United States for Kidnapping, not the opinion of this Court, as the law does not support this contention.

> **her, scream at her, hit her and inappropriately touch her in a sexual manner again.**

(Tr. at 16).  Coffman testified that Harold had not been able to reduce the risk of J.B. being returned to his home and that Coffman had never received a report from anyone who could recommend that J.B. have contact with Harold.

{¶18} As for J.B., Coffman testified that she helped J.B. get into mental health counseling.  Coffman testified that J.B.'s grades had improved and that J.B. was doing better in school.  Coffman testified that J.B. received tutoring, and the record indicated that J.B. was involved in student council.  Coffman testified that Joseph and Julie were meeting all of J.B.'s needs and that legal custody being granted to them was in J.B.'s best interest.

{¶19} On cross-examination Coffman testified that although J.B. was 14 at the time of the hearing, "[m]aturity wise" she was "more around 11."  (Tr. at 26).  Coffman also testified that J.B. would lie about "certain things" when she got in trouble.  (*Id.*)  However, Coffman testified that J.B. "does eventually tell the truth about what she may or may not have done."  (*Id.*)  Coffman also testified that Harold has always denied that the sexual abuse took place and that he had cooperated with her throughout the process.

{¶20} Joseph B. was the next witness to testify.  He testified that since J.B. had lived with him she was doing much better.  He testified that J.B.'s grades had improved and that she communicates well.  Joseph testified that J.B. would lie

from time to time but it was typical of other teenagers he had raised. Joseph testified that though J.B. would occasionally lie at first she would eventually tell the truth. Joseph testified that he was willing to serve as J.B.'s legal custodian and that he believed it was in her best interest.

{¶21} Julie J., Joseph's fiancé, was the next witness to testify. Julie testified that since being in her and Joseph's care J.B. had significantly improved. Julie testified that when J.B. was first brought to their home there were "cleanliness" issues with J.B. (Tr. at 40). Julie testified that J.B.'s "clothes smelled really bad and I had to teach her how to take a shower and shaving legs and girls stuff like that." (*Id.*) Julie testified that J.B.'s hygiene had significantly improved while living with her and Joseph. Julie also testified that they had dealt with issues of J.B. lying but she testified that all children lie. Julie also testified that she was willing to become legal custodian of J.B. and that she believed it was in J.B.'s interest.

{¶22} The GAL for J.B. then testified. The GAL reiterated the statements made in her final report, indicating that J.B. did not want contact with Harold. The GAL testified that she did not believe that J.B. could handle even supervised visitation with Harold. The GAL testified to an additional allegation from 2002 that had not previously been mentioned wherein Harold purportedly left J.B. in an unattended car so he could go smoke marijuana. Ultimately the GAL testified that

the no-contact order should remain in place, and that she felt that it was in the best interest of J.B. for legal custody to be granted to Joseph and Julie.

{¶23} Stephanie S., J.B.'s mother, was the next witness to testify. She testified that she was unable to care for J.B. full time but she still wanted visitation, even if it was supervised. Stephanie testified that she supported legal custody being granted to Joseph and Julie.

{¶24} Harold was the final witness to testify. Harold testified that he was not employed due to having back surgery and a triple bypass. Harold testified that he was on disability and received $742 per month.

{¶25} Harold testified that the allegations J.B. made against him were not true and he felt that she made them up because he could not buy her "Ipods" and "cell phones" and that he would not let "her go to friends that, you know, [were] involved with marihuana and stuff." (Tr. at 68). Harold testified that J.B. did not want to live with him and that she said she would make things up to get out of his care.

{¶26} Harold testified that at that time no charges had been filed against him for sexual assault. He also testified that he had never threatened to kidnap J.B. Harold testified that he could provide for J.B., that he wanted her back in his care and that he believed Julie and Joseph were influencing her against him.

{¶27} At the conclusion of the hearing, the magistrate stated that it would take the matter under advisement and issue a written decision. On June 25, 2015, the magistrate filed a decision analyzing the evidence. After reviewing the evidence the magistrate determined that the agency had made reasonable efforts to support reunification but Harold had "failed to sufficiently reduce the threat level to the child[.]" (Doc. No. 85). The court found that it was in J.B.'s best interest that J.B. be placed in the legal custody of Joseph and Julie.

{¶28} Harold filed objections to the magistrate's decision, contending that it was not in J.B.'s best interest that legal custody be granted to Joseph and Julie. Harold also filed supplemental objections to the magistrate's decision, contending that the agency failed to establish that it made reasonable efforts to support reunification.

{¶29} On October 21, 2015, the trial court filed its judgment entry independently reviewing the record and analyzing Harold's objections. Ultimately the trial court overruled Harold's objections. The trial court then stated a final judgment entry would be prepared. Harold filed a notice of appeal from the trial court's entry overruling his objections. This Court dismissed Harold's appeal as the trial court had not issued a final judgment on the matter.

{¶30} On November 17, 2015, the trial court issued a final judgment awarding legal custody of J.B. to Joseph and Julie and terminating court-ordered

supervision. It is from this judgment that Harold appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THAT THE TRIAL COURT BELOW COMMITTED ERROR PREJUDICIAL TO THE APPELLANT IN AWARDING LEGAL CUSTODY OF THE MINOR CHILD J.B. TO JOSEPH [B.] AND JULIE [J.].**

**ASSIGNMENT OF ERROR 2**
**THAT THE TRIAL COURT BELOW COMMITTED ERROR PREJUDICIAL TO THE APPELLANT IN FINDING THAT THE ALLEN COUNTY CHILDREN SERVICES BOARD MADE REASONABLE EFFORTS FOR THE CHILD TO RETURN TO THE CUSTODY OF THE APPELLANT.**

*First Assignment of Error*

{¶31} In Harold's first assignment of error, he argues that the trial court erred in awarding legal custody of J.B. to Joseph B. and Julie.

{¶32} At the outset we note that the award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.,* 10th Dist. No. 12AP–985, 2013–Ohio–3214, ¶ 7. This is because the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 17. Since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7.

{¶33} "In such a case, a parent's right to regain custody is not permanently foreclosed." *In re B.P.*, 3d Dist. Logan No. 8-15-07, 2015-Ohio-5445, ¶ 19, citing *In re M.J.M.,* 8th Dist. Cuyahoga No. 94130, 2010–Ohio–1674, ¶ 12. For this reason, unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard the trial court uses in making its determination in a legal custody proceeding is the less restrictive " 'preponderance of the evidence.' " *In re B.P.*, ¶ 19, quoting *In re M.J.M* at ¶ 9, citing *In re Nice,* 141 Ohio App.3d 445, 455 (7th Dist.2001). "Preponderance of the evidence" means evidence that is more probable, more persuasive, or of greater probative value. *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012–Ohio–5514, ¶ 7. In a dispositional hearing involving legal custody, the focus is on the best interest of the child. *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 10.

{¶34} In considering a disposition of legal custody, R.C. 2151.353(A)(3) does not list specific factors a court should consider in deciding what is in the child's best interest. *In re B.P.*, 3rd Dist. Logan No. 8-15-07, 2015-Ohio-5445, ¶ 20, citing *In re N.P.,* 9th Dist. Summit No. 21707, 2004–Ohio–110, ¶ 23, citing *In re Fulton,* 12th Dist. Butler No. CA2002–09–236, 2003–Ohio–5984, ¶ 11. Although there is no specific test or set of criteria that must be followed in determining what is in a child's best interest in a legal custody case, other

appellate courts have held that the R.C. 2151.414(D) factors may be "instructive." *See, e.g., In re Howland Children,* 5th Dist. Stark No. 2015CA00113, 2015–Ohio– 3862, ¶ 7; *In re D.T.,* 8th Dist. Cuyahoga Nos. 100970, 100971, 2014–Ohio–4818, ¶ 20. These factors include: the interaction of the child with the child's parents, relatives and caregivers; the wishes of the child, as expressed directly by the child or through the child's GAL; the custodial history of the child; and the child's need for a legally secure permanent placement. R.C. 2151.414(D).

{¶35} The trial court's decision to grant or deny a motion for legal custody is within its sound discretion and will not be reversed absent an abuse of discretion. *In re B.P.*, *supra*, at ¶ 21. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

{¶36} In this case the magistrate conducted a hearing on the ACCSB's motion to modify temporary legal custody and determined that it was in J.B.'s best interest that Joseph and Julie be granted legal custody of J.B. Harold objected to the magistrate's decision and the trial court overruled that objection, reasoning as follows.

> **Here, [J.B.] repeatedly expressed her wishes to her caseworker, to her Guardian ad litem and to her temporary custodians [that she did not wish to return to her father's custody]. She has expressed that she is fearful of being returned to her father, or even having contact with him through visitations. This is not an unexpected sentiment given her repeated and unwavering**

-14-

> **reports that she was sexually abused by her father. The Father exacerbated that situation by having contact with the Child contrary to a no-contact order entered by this Court. Those violations rendered the Child even more fearful of her Father. To force her to return to the care of the parent she continues to report to have sexually abused her would certainly not be in her best interest. The Court is aware that the Father continues with his unwavering denial that he sexually abused the Child and that he has not been adjudicated to have done so. Nevertheless, the agreed adjudication of the Child as dependent entered in the Logan County Juvenile Court incorporates a finding that her condition or environment was such as to warrant the state in the interest of the child in assuming the child's guardianship. That condition or environment at this point remains unchanged, notwithstanding the services provided or encouraged by the Board. The circumstances of the estrangement which led to the removal remain unresolved.**

(Doc. No. 105).

{¶37} Harold now renews his arguments on appeal that the decision of the trial court to grant legal custody of J.B. to Joseph and Julie was not in J.B.'s best interest. Specifically, Harold contends that while he did violate the no-contact order, he otherwise complied with the case plan, and the sexual abuse allegations had never "been proven or tested by physical evidence or open litigation." (Appt.'s Br. at 11). Harold also contends that the trial court relied primarily on J.B.'s wishes in granting legal custody to Joseph and Julie.

{¶38} Contrary to Harold's arguments, the trial court's determination was supported by the record for multiple reasons. Although at the time of the legal custody hearing Harold had not been criminally charged related to J.B.'s

allegations of sexual abuse, there was testimony that an investigation was still ongoing. J.B.'s caseworker also testified that the sexual abuse allegations were indicated, and that J.B. consistently maintained that she was sexually abused.

{¶39} However, even if we did not consider the sexual assault allegations on the basis of Harold's steadfast denials and the lack of a current criminal prosecution, there were multiple other reasons in the record to support the trial court's decision. There was testimony that a separate "physical abuse" allegation of J.B. was substantiated due to Harold's marihuana use. In addition, there was testimony that when J.B. first began living with Joseph and Julie, she lacked the knowledge to perform basic feminine hygiene and that her clothes smelled particularly bad. Moreover, Harold had also admitted that J.B. was a dependent child previously, as the trial court stated.

{¶40} Furthermore, there was clear testimony from everyone involved in this case other than Harold that J.B. was doing well with Joseph and Julie, and that J.B. had bonded with them. There was clear testimony that J.B. wanted to continue living with Joseph and Julie, and that she was afraid to even have minimal interaction with Harold. This fear was exacerbated by Harold violating the no-contact order at least *four times* during the pendency of this case. These incidents included driving alongside J.B.'s school bus, approaching J.B. at her bus stop and talking to her, and taking pictures of J.B. across the street from her bus

stop. (Tr. at 12). Finally, the GAL testified that it was in J.B.'s best interest for Joseph and Julie to be granted legal custody. Joseph and Julie both readily testified that they were willing to serve as J.B.'s legal guardians.

**{¶41}** As there is competent credible evidence to support the trial court's decision in the record before us we cannot find that the trial court abused its discretion in determining that it was in J.B.'s best interest that legal custody be granted to Joseph and Julie. Therefore, Joseph's first assignment of error is overruled.

*Second Assignment of Error*

**{¶42}** In Harold's second assignment of error he argues that the trial court erred in determining that the agency made reasonable efforts for J.B. to return to Harold's custody.

**{¶43}** Section 2151.419(A)(1) of the Revised Code governs reasonable efforts by a public children services agency "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The agency has the burden of proving that it has made those reasonable efforts. *In re B.P.*, 3d Dist. Logan No. 8-15-07, 2015-Ohio-5445, ¶ 39.

**{¶44}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the

child's removal or as a predicate to reunification.' " *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12–15 and 16–12–16, 2013–Ohio–4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Id.,* quoting *In re M.A.P.,* 12th Dist. Butler Nos. CA2012–08–164 and CA2012–08–165, 2013–Ohio–655, ¶ 47. " 'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' " *In re A.M.A.,* 3d Dist. Crawford No. 3–1302, 2013–Ohio–3779, ¶ 29, quoting *In re Leveck,* 3d Dist. Hancock Nos. 5–02–52, 5–02–53, and 5–02–54, 2003–Ohio–1269, ¶ 10. "We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount." *Id.,* citing R.C. 2151.419(A)(1).

{¶45} In this case the magistrate determined that the agency made reasonable efforts to support reunification.[3] Harold objected to the magistrate's decision and the trial court overruled that objection, finding as follows.

> **The Court has also considered the Father's objection to the finding that the Board did not make reasonable efforts to remedy the circumstances which led to the removal of the child. In fact, the caseworker testified that the Child has been in**

---

[3] During the reviews to continue temporary custody the trial court also regularly made findings that the ACCSB was making reasonable efforts to support reunification.

**individual counselling \* \* \* at Family Resource Center to address the issues. The father has completed a psycho-sexual assessment[.] The latter was of limited value because of the potential for a criminal prosecution relating to the alleged sexual abuse. The father was referred and attended parenting classes. The father was referred by the caseworker for individual counselling, but as of the time of the hearing, had not yet begun that counselling. None of these services have to date been successful in reducing the level of fear which the Child experiences at the prospect of being around her father. That lack of results does not mean that the Board's efforts were something less than reasonable.**

(Doc. No. 105).

{¶46} Harold now renews his argument on appeal that the trial court erred in determining that the agency made reasonable efforts, contending that the efforts by the agency should at least support some chance of reunification and they did not in this case. Harold argues that the services provided were "useless" and were only attempted for a period of three months.

{¶47} Contrary to Harold's arguments, Harold's own actions prohibited the case plan from proceeding any further toward reunification. After the sexual assault allegations were made by J.B. against Harold, J.B. was removed from Harold's home and a no-contact order was issued against Harold. Testimony at trial indicated that Harold violated that order no less than four times. These impromptu violations led to J.B. being more fearful of Harold. J.B.'s GAL testified that prior to Harold violating the no-contact order, she was getting to a point where she would have potentially considered brief supervised visits with

Harold. However, after Harold's violations, J.B. became worried that Harold was going to kidnap her and harm her again.

{¶48} In addition, while Harold "complied" with the case plan to undertake a psycho-sexual evaluation, testimony indicated that Harold could not answer all the questions due to the ongoing investigation and Harold's cognitive limitations.

{¶49} The record reflects that Harold had completed some aspects of the case plan. The Agency's caseworker testified that she had gotten Harold into parenting classes, which he completed. The agency also referred Harold to counseling and Harold had apparently contacted potential counselors.

{¶50} Notably, the agency also worked with J.B. to support potential reunification, getting her into counseling. All indications were that J.B. was improving her ability to communicate and that she was doing better in school.[4]

{¶51} While Harold had complied with, and completed some of, the case plan in this case, we cannot find that the trial court erred in determining that the agency made reasonable efforts to support reunification. As the trial court stated, even though the services did not ultimately lead to reunification, it does not mean the ACCSB's efforts were unreasonable, particularly in light of Harold's actions. Therefore, Harold's second assignment of error is overruled.

---

[4] The GAL's final report did indicate that as the legal custody hearing approached J.B. was having difficulty in school again.

{¶52} For the foregoing reasons Harold's assignments of error are overruled and the judgment of the Allen County Common Pleas Court, Juvenile Division, is affirmed.

***Judgment Affirmed***

**PRESTON and ROGERS, J.J., concur.**

**/jlr**