[Cite as *In re A.C.*, 2020-Ohio-980.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

A.C.,

CASE NO. 1-19-20

ADJUDICATED DEPENDENT CHILD.

O P I N I O N

[Melissa C. - APPELLANT]

IN RE:

T.C.,

CASE NO. 1-19-21

ADJUDICATED DEPENDENT CHILD.

O P I N I O N

[Melissa C. - APPELLANT]

IN RE:

T.C., JR.

CASE NO. 1-19-22

ADJUDICATED DEPENDENT CHILD.

O P I N I O N

[Melissa C. - APPELLANT]

**Appeals from Allen County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 2016 JG 33612, 2016 JG 33613 and 2016 JG 33614**

**Judgments Affirmed**

**Date of Decision: March 16, 2020**

Case Nos. 1-19-20, 1-19-21, 1-19-22

---

**APPEARANCES:**

*Linda Gabriele* **for Mother-Appellant**

*Sarah N. Newland* **for Appellee**

**SHAW, P.J.**

**{¶1}** Mother-appellant, Melissa C. ("Melissa"), brings these appeals from the April 8, 2019 judgments of the Allen County Common Pleas Court, Juvenile Division, granting legal custody of Melissa's children A.C., T.C., and T.C., Jr., to Gale M. ("Gale"). On appeal, Melissa argues that the trial court erred by determining that it was in the children's best interests to award legal custody to Gale, and that the trial court erred by determining that the Allen County Children's Services Board ("the Agency") engaged in reasonable efforts to reunify the children with Melissa.

*Background*

**{¶2}** Melissa and Tyriece C. are the parents of three children: A.C., born in September of 2010, T.C., born in September of 2012, and T.C., Jr., born in January of 2014. At the inception of this case, Melissa and Tyriece had been together for approximately fifteen years and they were engaged to be married in 2011. Their relationship was, at times, tumultuous including accusations that Tyriece was

-2-

unfaithful and that he committed domestic violence against Melissa. In fact, Tyriece had been charged with domestic violence perpetrated against Melissa numerous times; however, he was never convicted as Melissa either did not attend the court hearings or she requested that the charges be dismissed.

{¶3} Sometime in or around 2015, Melissa had a heart valve replaced. Afterward she had a stroke and she was later diagnosed with lupus. Initially, the stroke significantly impaired Melissa such that she could barely speak, she could not swallow, drive, dress herself, feed herself, tie her own shoes, or do her hair.

{¶4} On April 22, 2016, the Agency received a report concerning Melissa's inability to care for the children. The report stated that Melissa's health issues prevented her from being able to adequately care for the children, particularly as Tyriece had been in and out of the residence due to his infidelity. A specific instance was cited wherein two of Melissa's children were left in a bath with scalding hot water while food was burning in the oven, causing the smoke alarms to go off. The Agency was also concerned with the domestic violence allegations, particularly instances that allegedly occurred in front of the children.

{¶5} On June 6, 2016, a shelter care hearing was held wherein it was determined that there was probable cause to believe that the conduct, conditions, or surroundings of the children were endangering the children's health, welfare, or safety. It was determined that the continued residence of the children in their home

would be contrary to their best interests. At Melissa's request, the children were placed in the temporary care and custody of Gale in lieu of shelter care, pending adjudication and disposition.

{¶6} Gale was not related to Melissa; however, Gale had been close with Melissa's father and she had a close relationship with Melissa such that Melissa even referred to her as "mom" or "mother" at times in the past. Melissa had also lived with Gale when Melissa was released from a five-year prison term.

{¶7} Further, Gale played a grandmother-type role to Melissa's children, taking care of them whenever Melissa had a new child or when Melissa and Tyriece were fighting or needed a break. Melissa specifically requested that her children be placed with Gale when the children could not be placed with Melissa's actual mother Rhonda because Rhonda already had legal custody of three of Rhonda's other grandchildren (not Melissa's children).[1]

{¶8} On June 7, 2016, complaints were filed alleging that the children were dependent pursuant to R.C. 2151.04(B)/(C). In addition to concerns previously mentioned related to Melissa's inability to care for the children and domestic violence between Melissa and Tyriece, the complaints cited concerns with drug trafficking in the home.

---

[1] Rhonda had actually cared for Melissa's oldest child, now an adult, while Melissa was in prison.

{¶9} A Guardian ad Litem ("GAL") was appointed for the children and attorneys were appointed for each parent individually.

{¶10} On July 5, 2016, case plans were filed seeking to provide the children with a safe and stable environment. The case plans also had goals of, *inter alia*, making Melissa and Tyriece understand how violence and drug use negatively impacted the children. Notably, the case plans stated that the parents had both tested positive for drugs in recent screenings, specifically THC and cocaine. Despite testing positive, Melissa denied using cocaine.

{¶11} On August 5, 2016, an adjudicatory hearing was held before a magistrate. At the hearing, Melissa and Tyriece each consented to a finding of dependency for the children pursuant to R.C. 2151.04(B) and (C). The magistrate found that reasonable efforts had been made toward reunification. The cases were set for a dispositional hearing on August 26, 2016.

{¶12} On August 19, 2016, prior to the scheduled dispositional hearing, the GAL filed a written report. The GAL conducted an investigation and at the time of the report Melissa had not completed the "Choose Your Partner Carefully" course and Melissa had five positive drug screens. Melissa had no income and was awaiting approval for social security disability benefits. The report stated that

although Tyriece and Melissa argued often, and had previously separated, they had now moved back in together and had actually recently gotten married.[2]

{¶13} The GAL noted that concerns had been brought to the Agency that Tyriece was trafficking drugs—Tyriece and Melissa were codefendants in a 2003 drug case. The GAL also noted that the children were bonded together, that they should not be separated, and that Melissa's health was improving. The GAL recommended that the children stay in Gale's temporary custody based on Melissa's inability to multitask or care for the children without assistance from others.

{¶14} On August 26, 2016, a dispositional hearing was held before a magistrate wherein it was determined that temporary custody of the children would remain with Gale. Tyriece and Melissa were given supervised parenting time.

{¶15} On September 29, 2016, the trial court filed judgment entries adopting the magistrate's dependency adjudications of the children pursuant to R.C. 2151.04(B) and (C). In addition, on the same date the trial court filed judgment entries adopting the magistrate's dispositional recommendation of temporary custody to Gale, finding that it was in the children's best interests.

{¶16} On February 23, 2017, a motion for contempt was filed against Tyriece for continuing to have positive drug screens.

---

[2] Melissa would later claim the marriage was on advice of counsel.

{¶17} On April 27, 2017, the Agency filed a motion requesting modification/termination of the trial court's dispositional order for the children. Specifically, the Agency requested that legal custody be granted to Gale with the parents retaining residual rights and that the trial court terminate services by the Agency.

{¶18} Amended case plans were filed seeking to provide the children with a safe and stable environment. Statements in the case plans indicated that Tyriece had taken twelve drug screens since June of 2016: one was negative for all substances, six were positive for marijuana, three were positive for cocaine, and two were positive for marijuana and cocaine. As for Melissa, she had taken eleven drug screens since June of 2016, two were positive for cocaine only, one for marijuana only, one for cocaine and marijuana, and seven tests were negative.

{¶19} On May 8, 2017, the GAL filed a report recommending that legal custody be awarded to Gale as the children were bonded with her, there were drug issues with the parents, and there were safety concerns with the parents related to domestic violence.

{¶20} Also on May 8, 2017, the magistrate held a hearing on the contempt motion against Tyriece wherein Tyriece admitted to being in contempt of court for his positive drug screens. The magistrate's finding of contempt was adopted by the trial court. The matter was set for sentencing at a later date.

{¶21} The magistrate then set a hearing for "First Annual Review," for sentencing on Tyriece's contempt, and for the Agency's motion for modification of disposition on August 9, 2017.

{¶22} On July 27, 2017, Melissa filed motions for modification of disposition requesting that the children be reunited with her.

{¶23} On August 2, 2017, the GAL filed another report recommending that the children be placed in Gale's legal custody. The report stated that while Melissa had made progress with items in her case plan, there were still issues of domestic violence, verbal abuse, threats, and drugs. In fact, the GAL indicated that Tyriece had stated he would continue to use marijuana. Melissa's adult daughter also expressed concerns with Melissa's ability to care for the children. The GAL noted that on some of the supervised visits with the children Melissa spent much of the time on her cell phone. The children also stated that they had seen Tyriece "push" Melissa down.

{¶24} Although subpoenas had been issued, witness lists had been exchanged, and the motions for modification of disposition were set to be heard on August 9, 2017, a series of continuances delayed the start of the hearing and its ultimate conclusion. At the August 9, 2017 hearing, Tyriece's counsel requested that the matter be continued due to a death in counsel's family. The matter was continued to October 25, 2017.

{¶25} On October 13, 2017, Tyriece filed a handwritten motion requesting a new attorney.

{¶26} On October 16, 2017, the GAL filed a motion to withdraw because she had accepted a position with the Social Security Administration. The GAL's motion was granted and a new GAL was appointed for the children.

{¶27} On October 23, 2017, Tyriece's attorney filed a motion to withdraw.

{¶28} On October 25, 2017, the date the disposition modification hearing was rescheduled for, the new GAL requested a continuance to complete her investigation. Tyriece's attorney was also permitted to withdraw and a new attorney was appointed for him. The case was then rescheduled again for hearing on December 7, 2017, and December 14, 2017.

{¶29} On December 1, 2017, mother filed an amended motion for placement/legal custody of the children.[3]

{¶30} On December 7, 2017, the first day of the hearing on the motions to modify disposition was held.[4] At the hearing the Agency first presented the testimony of a caseworker involved with the matter. Aside from the issues already mentioned herein regarding Melissa's stroke, the bathtub/kitchen incident, and the domestic violence accusations, the caseworker testified that Tyriece had made a

---

[3] At one point, Tyriece also filed to be legal custodian of the children; however, he withdrew that motion.
[4] The hearing was also for a first annual review and for sentencing of Tyriece's contempt; however, neither of those issues are subject to this appeal so we will not further address them.

video of his four-year old son driving a car on his paternal uncle's lap during a supervised visitation, which the caseworker stated was inappropriate and unsafe.

{¶31} In addition, the caseworker testified that she stopped meeting with Tyriece and Melissa at their home because the caseworker felt Tyriece had made threats to her. The caseworker stated that while conducting a drug screen of the parents at their residence, Tyriece made the statement that, "I wish I could get away with murder, because I would pop you mother fuckers." (Dec. 7, 2017, Tr. at 17). The caseworker also stated that after she was leaving court on one occasion she walked in front of Tyriece's parked car and he revved the engine. In addition, the caseworker testified that Melissa's adult daughter had stated that Melissa and Tyriece were selling drugs out of their home.

{¶32} The caseworker noted that Melissa had made progress on the case plan, especially since she had no failed drug tests since May of 2017. In addition, the caseworker testified to numerous classes that Melissa and Tyriece had completed. They also had complied with attending counseling. Nevertheless, the caseworker did not feel that the parents had reduced the level of risk to the children. The caseworker thought the children were doing well with Gale, that they were involved in activities, and that they were bonded with Gale, having been with Gale for well in excess of a year.

{¶33} The Agency also presented Gale's testimony. Gale testified as to the children's living and sleeping arrangements. She indicated that she had moved with the children since this case began because her home since 1995 had been foreclosed upon.

{¶34} Gale testified that she had known Melissa since Melissa was ten, and that Melissa once called her mother or mom. Gale testified that Melissa had healed from the stroke but Melissa was not the same—not as alert. Gale testified that Melissa and Tyriece had been using drugs since she had known them. Gale detailed an incident wherein the parents went to her place of employment and told the employer that Gale was ruining the parents' lives, which caused Gale to nearly be fired.

{¶35} Gale testified that Melissa and Tyriece only wanted the children when they wanted them, not all the time. She testified that she was willing to serve as legal guardian, and to facilitate a relationship between the children and their parents. She testified that while the children loved their parents it was not in their best interests to be around them. Following Gale's testimony, the Agency rested its case. As the parents still had yet to present their cases, the hearing was continued to a second day.

{¶36} Melissa filed a motion to continue the second day of the hearing as her counsel had a personal family emergency and was out of town. That motion was granted.

{¶37} On January 3, 2018, the Agency filed a motion for leave to reopen its direct examination on the basis that there had been a new arrest of Tyriece on December 16, 2017, for domestic violence perpetrated against Melissa. The Agency's motion was granted.

{¶38} On February 9, 2018, Melissa's attorney filed a motion to withdraw stating that there was a substantial departure of opinion and the attorney believed he was ethically obligated to withdraw. He was permitted to withdraw, a new attorney was appointed for Melissa, and the matter was continued.

{¶39} On April 17, 2018, the GAL filed a motion for an in camera interview of the oldest child, A.C.

{¶40} On April 24, 2018, the matter proceeded to the second day of the hearing on the motions to modify the dispositional order. At the hearing, the Agency's caseworker provided additional testimony about the domestic violence incident between Tyriece and Melissa that allegedly occurred on December 16, 2017. Tyriece had allegedly strangled Melissa while Melissa's friend was present. Melissa wrote a statement to police at the scene, but she did not mention or acknowledge any violence; rather, the choking incident was relayed by Melissa's

friend. Despite officers noting red marks on Melissa's neck consistent with the statement of Melissa's friend who had allegedly observed Tyriece choke Melissa, the charges against Tyriece were dismissed at Melissa's request.

{¶41} However, the Agency caseworker testified that while the criminal case was pending against Tyriece, part of Tyriece's bond prevented him from having contact with Melissa. Testimony indicated that Tyriece violated that order multiple times, including through Melissa's facilitation.

{¶42} Nevertheless, the Agency caseworker testified that Melissa was no longer residing with Tyriece, and that she may have been seeking a divorce. Melissa had her own residence, which was suitable for the children. However, the caseworker testified that Melissa was not demonstrating the skills learned in the classes she had completed because she continued to let questionable individuals around her children. The caseworker detailed an incident where during a visit to Melissa's home an individual was present relaxing on Melissa's bed who had a significant criminal history. In addition, the caseworker testified that a law enforcement unit had confirmed allegations made to the Agency that drug sales had occurred at Melissa and Tyriece's residence, though no charges were filed. (April 24, 2018, Tr. at 65). The Agency maintained that the children should be placed in Gale's legal custody. The Agency then rested its case.

{¶43} Melissa presented the testimony of multiple friends and people who had supervised her visitation with the children. The testimony indicated that while Melissa was significantly impaired by the stroke initially, she had recovered to between 90 to 99 percent, depending on who was testifying. Melissa actually rated herself among the lowest of those who testified, at 90 percent recovered. It was not clear from the testimony in what area(s) she had yet to recover. The individuals supervising Melissa's visitation testified that Melissa was a great, loving mother and that she could care for the children.

{¶44} Melissa testified on her own behalf that she had a home that was largely paid for through MET housing,[5] and that she was receiving $749 per month in social security disability benefits. She indicated that if the children were returned to her care she would receive over $600 monthly in food stamps. Melissa testified that she was done with Tyriece and that she was seeking a divorce due to mental abuse and infidelity. Melissa testified that Tyriece was having a child with another woman and that she did not have to rely on him financially anymore.

{¶45} Melissa had tested clean on all of her drug tests for over a year. She criticized Gale's care of the children, stating that the children were not clean and that they smelled when she received them for her supervised parenting time. In addition, Melissa testified that Gale's husband had exhibited racism, and Melissa

---

[5] Melissa testified that her rent was $660 per month and that she paid $71 of it.

thought that he drank to excess. With all these issues in mind, Melissa maintained she was able to provide secure and adequate housing for the children, so they should be returned to her.

{¶46} Although Melissa was reserved regarding domestic violence allegations, she did acknowledge it was a problem, and she testified about one incident wherein she jumped on the hood of a car to try to stop Tyriece from taking it and Tyriece sped up while Melissa was on top of it, causing her to fall off and be injured.

{¶47} Melissa also presented Gale's testimony, wherein Gale revealed that she had moved again, thus living in three residences since the children had been placed in her care. Gale worked at a gas station approximately thirty hours per week. She was married, but her husband was in and out of the home, at times staying with one of their children.

{¶48} There were accusations made that Gale's husband consumed a significant amount of alcohol and that he had made racist statements in the past. Gale testified that her husband had never made a racial slur in the presence of the bi-racial children, and that her husband's problems were largely with Tyriece. Gale denied any drinking issues with her husband, though she acknowledged that he had an alcohol-related conviction in the past.

{¶49} Melissa's mother, Rhonda, was not available to testify on the second day of the hearing due to having surgery, so the hearing was continued to a third day, set for June of 2018.

{¶50} Prior to the final day of the hearing, the new GAL filed a report and recommendation that the children should be returned to Melissa's care. The GAL cited issues with Gale's husband drinking and using inappropriate racial language, and she also cited the children being whipped with a paddle by Gale as excessive punishment. The GAL indicated that Melissa had done everything asked of her in the case plan.

{¶51} On June 8, 2018, an in camera interview was held of A.C., the oldest child of Melissa and Tyriece. A.C. was seven years old at the time. A transcript of that interview was produced, and in the interview A.C. stated that there was nothing she would change about her "grandma" Gale's residence, and nothing she would change about her mother's residence. A.C. stated that she wanted to remain in school where she was; however, she would prefer to stay with her mother or at least see her mother more often. A.C. also stated that if she had her way she would not live with her brothers because they did not get along when they were picking television shows to watch.

{¶52} The final day of the hearing on the motions for modification of disposition was held before a magistrate on June 13, 2018. At the hearing, Melissa's

mother, Rhonda, who had supervised many of Melissa's visits with her children, provided testimony that Melissa was approximately 92 percent recovered from her stroke. Rhonda testified that the children had made accusations of Gale's husband using the "n-word" and that Gale's husband had tried to feed the children dog food. Rhonda testified that she was aware of the domestic violence in the home between Tyriece and Melissa.

{¶53} The GAL also provided testimony at the final hearing, indicating that while she believed Gale would ensure that the children were cared for the GAL was not certain Gale would foster a good relationship between the children and Melissa. The GAL reiterated her written recommendation that the children be returned to Melissa's care. After the Agency called the caseworker on rebuttal, the matter was submitted for decision.

{¶54} On June 20, 2018, the GAL filed a report with "additional considerations." In the report the GAL called Melissa a "hero" and reiterated her recommendation that the children be placed with Melissa. However, the GAL did note that she was unsure what life will look like for the children if they were returned to Melissa because she had not received enough visitation and that the visitation was supervised.

{¶55} On October 26, 2018, the magistrate filed its decision in this matter granting legal custody of the children to Gale, denying Melissa's motion for

custody, and terminating the Agency's involvement. The magistrate conducted an extensive review of the case in its decision, reviewing the Agency's involvement, Melissa's progress with the case plan, the children's bond with Gale, and the decisions of Melissa over the preceding years. The magistrate reviewed all the testimony presented and made credibility findings, in particular finding one of Melissa's witnesses not to be credible at all. The magistrate also believed that Melissa and Tyriece would continue to have a relationship despite Melissa living on her own at the conclusion of court involvement. The magistrate noted that it did have some concern with Gale's husband; however, on balance, by a preponderance of the evidence, the magistrate felt that the children should be placed in Gale's legal custody, with the parents maintaining residual rights. Melissa's parenting time was increased from where it had been.

{¶56} On November 6, 2018, Melissa filed objections to the magistrate's decision. After transcripts of the hearing were produced and filed, Melissa supplemented her objections on February 25, 2019.

{¶57} On March 4, 2019, the GAL filed a "report" to the trial court joining in Melissa's objections, stating that the Agency failed to make reasonable efforts to support reunification.

{¶58} On March 11, 2019, the Agency filed a response to the objections

{¶59} On April 2, 2019, the trial court filed an entry analyzing the objections that had been made to the magistrate's decision. The trial court grouped the objections made into two primary categories: 1) the magistrate erred by finding that the Agency made reasonable efforts to reunify Melissa with the children; and 2) the magistrate erred by finding that it was in the children's best interests for Gale to be awarded legal custody.

{¶60} Dealing first with the efforts made by the Agency to foster reunification, the trial court listed the extensive services that had been conducted in this case by the Agency and concluded that the Agency was not required to make *all* efforts, just reasonable efforts to support reunification, and that had been done here.

{¶61} Nevertheless, the trial court did note that it was troubled by the length of time it took to complete the final hearing on the motions to modify disposition. Because so long had passed, the trial court stated that it did not have authority to extend temporary custody any longer since the children had already been in Gale's temporary custody for over two years. Thus the only options before the trial court were to award Gale legal custody or to return the children to Melissa.

{¶62} The trial court then addressed the issue of whether it was in the children's best interests for Gale to be granted legal custody or for the children to be returned to Melissa. The trial court stated that in its independent review and

analysis the magistrate properly determined the factual issues and appropriately applied the law. The trial court made factual findings leading to its decision.[6] The trial court did make some modifications to Gale's discretion regarding the exercise of parenting time by Melissa and Tyriece. Aside from these modifications, the trial court overruled the objections to the magistrate's decision.

{¶63} On April 8, 2019, final judgment entries were filed placing the children in the legal custody of Gale. It is from these judgments that Melissa appeals, asserting the following assignments of error for our review.[7]

**Assignment of Error No. 1**
**The trial court committed prejudicial error in awarding legal custody of the minor children to the temporary custodian contrary to the best interests of the children.**

**Assignment of Error No. 2**
**The trial court committed prejudicial error in finding that the Allen County Children Services Board made reasonable efforts for the children to return to the custody of the Appellant.**

{¶64} We elect to address the assignments of error out of the order in which they were raised.

---

[6] The GAL was particularly concerned with Gale's use of corporal punishment, but the magistrate and the trial court both found that there was no evidence of punishment that was excessive or abusive. The GAL also acknowledged in her testimony that Gale was learning that punishing the children by taking away their tablets was more effective in any event.

[7] Tyriece did not file an appeal in this matter.

-20-

*Second Assignment of Error*

**{¶65}** In Melissa's second assignment of error, she argues that the trial court erred by finding that the Agency had made reasonable efforts to return the children to Melissa's custody.

Relevant Authority

**{¶66}** Section 2151.419(A)(1) of the Revised Code governs reasonable efforts by a public children services agency "to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The agency has the burden of proving that it has made those reasonable efforts. *In re B.P.,* 3d Dist. Logan No. 8–15–07, 2015–Ohio–5445, ¶ 39.

**{¶67}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12–15 and 16–12–16, 2013–Ohio–4317, ¶ 95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Id.,* quoting *In re M.A.P.,* 12th Dist. Butler Nos. CA2012–08–164 and CA2012–08–165, 2013–Ohio–655, ¶ 47. " 'Nevertheless, the issue is not whether

there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' " *In re A.M.A.,* 3d Dist. Crawford No. 3–1302, 2013–Ohio–3779, ¶ 29, quoting *In re Leveck,* 3d Dist. Hancock Nos. 5–02–52, 5–02–53, and 5–02–54, 2003–Ohio–1269, ¶ 10. "We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount." *Id.,* citing R.C. 2151.419(A)(1); *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 44.

Analysis

{¶68} The magistrate in this case initially reviewed the Agency's case planning efforts and found that the Agency had exercised reasonable efforts to support reunification. Melissa and the GAL objected to the magistrate's decision, and the trial court conducted an independent review of the matter and determined as follows.

> **Here, the initial case plan approved and adopted by the Court's Entry dated September 29, 2016 incorporated a goal of reunification with a parent. The services contained in the case plan included case management, general counseling, referral of both parents to complete the ACT parent education course, referral of both parents for joint counseling at Coleman Professional Services, referral of the Mother for domestic violence and substance abuse education, referral of the Mother to complete the Choose Your Partner Carefully program, random drug screens for both parents, and referral of the Father to complete a domestic violence inventory and follow all recommendations. These services were designed to address a**

> **history of several domestic violence calls involving the Father's reported abuse of the Mother, and a history of substance abuse by both parents. Under the case plan, both parents were also to establish and maintain an appropriate residence with working utilities, and to secure a legal source of income to provide for the children's basic needs. The Court finds that the services provided by the Board, along with those referrals to other agencies, constitute reasonable case planning and diligent efforts to address the concerns raised early in the case and identified in the complaint.**

(1-19-20, Doc. No. 188).

{¶69} On appeal, Melissa argues that the trial court erred because there was clear evidence that she worked "through a long road to recovery to create a stable environment for the children." (Appt.'s Br. at 17). She contends that although she initially had issues with her health and with positive drug screens, she worked the case plan and completed all the required steps, including separating from Tyriece. Melissa argues that given all she had accomplished, the Agency failed to make reasonable efforts to facilitate the return of the children to her, particularly since the Agency did not allow Melissa to "graduate" from supervised visitation to unsupervised visitation. (*Id.*)

{¶70} Notably, after Melissa had her stroke, she was significantly impaired, thus during the early pendency of this case, after the children were placed with Gale, the Agency had good cause to recommend supervised visitation. As Melissa's health improved to the point where perhaps she could have exercised unsupervised visitation, she tested positive numerous times for various drugs, and she was still

testing positive for drugs on some screens *up until the Agency filed its motions for modification of disposition*. There were also continued reports to the Agency of drug trafficking in the home, and reports of domestic violence, which led to yet another domestic violence charge against Tyriece in December of 2017. Although there was a witness to this alleged incident, Melissa requested that the charges be dismissed, and denied that anything occurred at all.

{¶71} Melissa's own repeated poor judgment delayed her hopes of unsupervised visitation, not the Agency's lack of diligence. It is clear from this case that the Agency connected Melissa and Tyriece to a number of services. Melissa utilized the services provided and completed a number of classes and counseling. She also undertook drug screens as requested. In fact, the services provided by the Agency did seem to have some positive impact on Melissa by virtue of her clean drug screens and financial independence. However, by the time Melissa had done these things, the children had been with Gale for two years and they were in need of legally secure placement.

{¶72} In addition, Melissa continued to show poor judgment through her inability to demonstrate some of the things she had been taught in the classes that were provided by the Agency, such as looking into the background of the individuals in her life to see who was appropriate to have around her children. Melissa had wanted a friend named Deanna Green to move in with her, though

Deanna was supposed to remain at a specific residence as a condition of bond on a pending criminal case in Defiance, Ohio. Deanna Green also had a history with children's services agencies. Melissa told the Agency she was not aware she could look into Deanna's background, which the magistrate determined was a display of Melissa's inability to actually implement what she was learning in the classes she took. Melissa also had a man at her residence named Martrevius Burns during an unscheduled visit by the Agency. Burns had a history with the Agency including reports of unwanted sexual contact. Burns also had drug possession history. Melissa stated she did not look into Burns' background because he was just at her residence one time to move a washing machine; however, the caseworker saw Burns relaxing on Melissa's bed upstairs during the unscheduled visit and the magistrate specifically did not believe Melissa's testimony on this issue. Further bad judgment was shown as Melissa worked around her supervised visitation time by visiting the children while they were with a babysitter without asking Gale.

{¶73} Ohio Appellate Courts have determined that "where the evidence establishes that the agency provided services designed to alleviate the problem that led to the child's removal, made diligent efforts to assist the parents in remedying the problem, and attempted to transition the child back into the family home, the agency has proven reasonable efforts." *In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431, ¶ 26, citing *In re K.R.,* 5th Dist. Stark App. No.2009 CA 00061,

2009–Ohio–4350. In this case the Agency employed numerous services and we cannot find that simply because Melissa was unsuccessful in being reunited with her children that the Agency's efforts were less than reasonable. *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. As the law states, the Agency was not required to engage in *all* efforts, rather, reasonable efforts. *See, e.g.*, *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 44. On the basis of the record before us, we cannot find that the trial court erred in determining that reasonable efforts were exercised in this case. Therefore, Melissa's second assignment of error is overruled.

### First Assignment of Error

{¶74} In Melissa's first assignment of error, she argues that the trial court erred by finding that it was in the children's best interests to award legal custody to Gale.

### Relevant Authority

{¶75} The Ohio Revised Code defines "legal custody" as a

**legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities**

**personally unless otherwise authorized by any section of the Revised Code or by the court.**

R.C. 2151.011(B)(21).

**{¶76}** "[T]he award of legal custody is 'not as drastic a remedy as permanent custody.' " *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 32, quoting *In re L.D.,* 10th Dist. Franklin No. 12AP–985, 2013–Ohio–3214, ¶ 7. This is because the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 17. Since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7.

**{¶77}** "In such a case, a parent's right to regain custody is not permanently foreclosed." *In re B.P.,* 3d Dist. Logan No. 8–15–07, 2015–Ohio–5445, ¶ 19, citing *In re M.J.M.,* 8th Dist. Cuyahoga No. 94130, 2010–Ohio–1674, ¶ 12. For this reason, unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard the trial court uses in making its determination in a legal custody proceeding is the less restrictive " 'preponderance of the evidence .' " *In re B.P.,* ¶ 19, quoting *In re M.J.M* at ¶ 9, citing *In re Nice,* 141 Ohio App.3d 445, 455 (7th Dist.2001). " 'Preponderance of the evidence' " means evidence that is more probable, more persuasive, or of greater probative value. *In re M.G.,* 3d Dist. Allen No. 1-18-54, 2019-Ohio-906, ¶ 7,

quoting *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 33, citing *In re C .V.M.,* 8th Dist. Cuyahoga No. 98340, 2012–Ohio–5514, ¶ 7. In a dispositional hearing involving legal custody, the focus is on the best interest of the child. *In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431, ¶ 31, citing *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 10; *In re B.P.*, at ¶ 19.

**{¶78}** In considering a disposition of legal custody, R.C. 2151.353(A)(3) does not list specific factors a court should consider in deciding what is in the child's best interest. *In re B.P.,* 3d Dist. Logan No. 8–15–07, 2015–Ohio–5445, ¶ 20, citing *In re N.P.,* 9th Dist. Summit No. 21707, 2004–Ohio–110, ¶ 23, citing *In re Fulton,* 12th Dist. Butler No. CA2002–09–236, 2003–Ohio–5984, ¶ 11. Although there is no specific test or set of criteria that must be followed in determining what is in a child's best interest in a legal custody case, other appellate courts have held that the R.C. 2151.414(D) factors may be "instructive." *See, e.g., In re Howland Children,* 5th Dist. Stark No.2015CA00113, 2015–Ohio–3862, ¶ 7; *In re D.T.,* 8th Dist. Cuyahoga Nos. 100970, 100971, 2014–Ohio–4818, ¶ 20. These factors include: the interaction of the child with the child's parents, relatives and caregivers; the wishes of the child, as expressed directly by the child or through the child's GAL; the custodial history of the child; and the child's need for a legally secure permanent placement. R.C. 2151.414(D). Some courts also consider the factors contained in R.C. 3109.04(F)(1). In addition to the other related factors already

listed herein, R.C. 3109.04(F)(1) includes factors such as who is more likely to facilitate parenting time and the mental and physical health of all involved.

{¶79} A trial court's decision to grant or deny a motion for legal custody is within its sound discretion and will not be reversed absent an abuse of discretion. *In re B.P., supra,* at ¶ 21. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

Analysis

{¶80} In this case, Melissa argues that the evidence presented to the magistrate was compelling for reunification of her with her children. She claims she had made significant progress with her case plan, that she had ended her relationship with Tyriece, recovered from her stroke, obtained secure housing, and become financially independent. She notes that the GAL also supported reunification. In addition, Melissa claims there were issues with Gale as Gale had moved multiple times since the children had been in her care and there were questions about Gale's willingness to facilitate a relationship between Melissa and the children.

{¶81} In our own review of the matter, the evidence is abundantly clear that the magistrate and the trial court were not left with a clear "best" option for a disposition. By the time the trial court was reviewing the magistrate's decision, the

children had been in Gale's temporary custody for over two years and there was no opportunity to extend temporary custody. Regardless, it was clear that the children were in need of legally secure placement.

**{¶82}** The evidence did show that Melissa had made significant strides since the inception of this case, first and foremost with her health. However, it was never detailed in what capacity she still remained less than 100 percent of what she was previously, or in what area(s) she remained deficient, aside from some speech issues that were mentioned.

**{¶83}** Notwithstanding this point, it was Melissa's delayed progress on the case plan that led to the Agency filing for a motion for change of disposition seeking legal custody to be placed with Gale. Melissa and Tyriece repeatedly tested positive for multiple drugs and their tumultuous relationship continued to cause issues. In addition, there remained accusations of drug trafficking in their home.

**{¶84}** It was only after a significant time had passed that Melissa and Tyriece both began to have negative drug screens, thus Melissa was again improving. However, after this improvement, there was the alleged domestic violence incident in December of 2017. Melissa denied that anything happened, and requested that the charges be dismissed, which was consistent with her pattern of downplaying any abuse—though she did finally admit at the hearing that she had at least suffered mental abuse from Tyriece. She also acknowledged, at least in passing that there

were issues with domestic violence, stating that Tyriece had been charged three or four times but was not convicted because she did not go to court.[8] (Apr. 24, 2018, Tr. at 248, 252). Numerous witnesses testified to a history of domestic violence between Melissa and Tyriece.

{¶85} Nevertheless, regardless of what actually happened in December of 2017, while Tyriece was on bond for the charges, Melissa had contact with him multiple times despite a no contact order, further emphasizing her bad judgment since she initiated at least one of the contacts.[9] In fact, the magistrate explicitly stated that she believed that after the court case was done Melissa and Tyriece would continue to have a relationship even though Melissa testified to the contrary since they had a seventeen year history of splitting and reuniting.

{¶86} As to the second GAL's recommendation in this case that the children should be returned to Melissa, the first GAL recommended on multiple occasions that legal custody be granted to Gale. Moreover, the second GAL in this case did unequivocally state that she believed Gale would ensure that the children were safe, secure, and cared for. As the law states, the determination in a legal custody matter is on what is in the children's best interest and this would support the trial court's

---

[8] She claims she was never subpoenaed so she never went to court.
[9] Notably, "no statute requires a finding of parental unfitness as a prerequisite to an award of legal custody in cases where a child is adjudged abused, neglected, or dependent." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 21 (2006)

determination. *See In re B.P.,* 3d Dist. Logan No. 8–15–07, 2015–Ohio–5445, ¶ 19, citing *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 10. Further, the second GAL also stated that she was unaware of an incident of Melissa taking the children over to Tyriece's residence so Melissa could get money, which would have been improper under the court orders. The GAL stated this would concern her.

{¶87} Moreover, the magistrate and the trial court were fully aware in this case of the progress Melissa had made and the alleged issues with Gale's husband as the magistrate and the trial court mentioned them in their written analysis of the issues. The magistrate reasoned, and the trial court accepted over general objection, that the evidence did not establish that Gale's husband drank to excess or used racial slurs around the children and that, in any event, his role was limited in the care of the children. Additionally, the trial court was persuaded by the children's bond with Gale, the amount of time the children had been with Gale, their need for legally secure placement, and Melissa's penchant to still show some bad judgment despite her progress on other areas in the case plan. There was also clear emphasis in the magistrate's decision on safety and well-being of the minor children, which the magistrate found to be in jeopardy if the children were returned to Melissa. Furthermore, by all accounts the children seemed to be doing well in Gale's care and they were adjusted to their school in Waynesfield.

**{¶88}** Child custody determinations are some of the most difficult and agonizing decisions a trial court must make, thus we must give a trial court wide latitude in its consideration of evidence. *Carr v. Kaiser*, 3d Dist. Defiance No. 4-11-11, 2012-Ohio-2688, ¶ 25, citing *Davis v. Flickinger*, 77 Ohio St.3d 415 (1997). Based on all of the evidence presented, we cannot find that the trial court abused its discretion by finding by a preponderance of the evidence that legal custody of the children should be awarded to Gale, with residual rights remaining with Melissa. As the Supreme Court of Ohio has stated, because Melissa maintains residual rights, she may "petition the court for a modification of custody" in the future. *In re C.R.*, 108 Ohio St.3d 369, 2006–Ohio–1191, ¶ 17, citing *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 36. Therefore, Melissa's first assignment of error is overruled.

*Conclusion*

**{¶89}** For the foregoing reasons, Melissa's assignments of error are overruled and the judgments of the Allen County Common Pleas Court, Juvenile Division, are affirmed.

***Judgments Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**