[Cite as *In re M.H.*, 2021-Ohio-3642.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

M.H.,

CASE NO. 1-20-57

ADJUDICATED DEPENDENT
AND ABUSED CHILD.

**O P I N I O N**

[MONICA O. - APPELLANT]

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2019 JG 36152

**Judgment Affirmed**

Date of Decision: October 12, 2021

APPEARANCES:

*Linda Gabriele* for Appellant

**MILLER, J.**

{¶1} Appellant, Monica O., appeals the November 23, 2020 judgment of the Allen County Common Pleas Court, Juvenile Division, granting legal custody of M.H. to Janet W. For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} Monica and Malachai H. are the biological parents of M.H., born August 2017.[1] On May 31, 2019, the Allen County Children's Services Board ("ACCSB") filed a complaint alleging M.H. was a dependent, neglected, and abused child and requesting the trial court place M.H. in its temporary custody.[2] In its complaint, ACCSB alleged M.H. was taken to Lima Memorial Hospital complaining of a swollen leg and multiple bruises. M.H. was subsequently transferred to Nationwide Children's Hospital where a skeletal survey revealed 14 fractures, in various stages of healing, on M.H.'s body. Medical professionals determined that the injuries were the result of non-accidental trauma, and Monica could not account for the injuries.

{¶3} Following a shelter-care hearing, held that same day, the trial court found probable cause to believe M.H. was in immediate danger from her

---

[1] Although Malachai is a party to the proceeding, the record does not indicate that he filed a notice of appeal. Accordingly, our review focuses primarily on the trial court's findings as they relate to Monica.
[2] On June 11, 2019, ACCSB filed an amended complaint to reflect the additional statutory section of abuse pursuant to R.C. 2151.031(C). (Doc. No. 25).

surroundings and that removal was necessary to prevent immediate or threatened physical or emotional harm. The trial court also found probable cause to believe M.H.'s conduct, conditions, or surroundings were endangering her health, welfare, or safety. The trial court further found ACCSB made reasonable efforts to prevent the removal of M.H. from the home and eliminate the continued removal of M.H. from the home. Accordingly, the trial court placed M.H. in the shelter care of ACCSB.

{¶4} On June 28, 2019, ACCSB filed its first case plan which detailed its concerns that M.H. had been the victim of physical abuse while in the care of Monica and her then-boyfriend, Joshua P. Further, the perpetrator of the abuse was unknown and the explanation given by Monica and Joshua of how M.H.'s injuries occurred was not consistent with the type of injuries M.H. sustained. The case plan required Monica, in part, to cooperate with law enforcement in an effort to determine how the injuries to M.H. occurred, complete a parenting class and demonstrate the skills obtained therefrom while interacting with M.H., complete the Choose Your Partner Carefully course, and complete a mental health assessment and follow all recommendations of the assessment. Monica was also required to provide a safe and stable environment for herself and M.H. The case plan further indicated that M.H. was in the temporary care of a paternal relative.

{¶5} A second shelter-care hearing was held on July 3, 2019. At the conclusion of the hearing, the trial court found probable cause to believe that the conduct, conditions, or surroundings of the child were endangering the health, welfare, or safety of the child and that the continued residence of M.H. in the home would be contrary to her best interests and welfare. The trial court further found that ACCSB made reasonable efforts to prevent the removal of M.H. from the home and eliminate her continued removal. Thereafter, the trial court ordered M.H. into the temporary custody of Janet W., her paternal great-aunt, pending adjudication and disposition. The trial court noted that Monica and the GAL did not object to M.H. being placed into Janet's temporary custody. Additionally, the trial court further ordered all visitations between Monica and M.H. be supervised by Janet or some other individual approved by ACCSB.

{¶6} On July 25, 2019, an adjudicatory hearing was held before the magistrate. With respect to dependency, the magistrate found that ACCSB proved by clear and convincing evidence that M.H. was a dependent child, as the conditions or the environment of the child warranted the State, in the interests of the child, in assuming guardianship, due to M.H. receiving multiple fractures and bruising to her body while living in the home with Monica and Joshua. Regarding the allegations of abuse, the magistrate found by clear and convincing evidence that ACCSB proved M.H. exhibited evidence of physical injury inflicted other than by accidental

means or was an injury at variance with the history given for it pursuant to R.C. 2151.031(C). The magistrate further found that ACCSB made reasonable efforts to prevent the removal of M.H. from the home and eliminate her continued removal. Accordingly, the magistrate found M.H. to be a dependent child pursuant to R.C. 2151.04(C) and an abused child pursuant to R.C. 2151.031(C). The trial court dismissed the allegations that M.H. was a neglected child pursuant to R.C. 2151.03. The magistrate's decision reflecting the findings of the adjudication hearing was filed on August 13, 2019. In a judgment entry filed on September 5, 2019, the trial court adopted the magistrate's findings and recommendations with respect to adjudication.

{¶7} On August 20, 2019, a disposition hearing was held before the magistrate. At the conclusion of the hearing, the magistrate awarded temporary custody of M.H. to Janet. Further, the magistrate again found ACCSB made reasonable efforts to prevent the removal of M.H. from the home and eliminate her continued removal. The magistrate approved and journalized the case plan ACCSB filed on June 28, 2019. Further, the magistrate ordered all visitations between Monica and M.H. be supervised by Janet or some other individual approved by ACCSB. The magistrate's decision reflecting the findings of the dispositional hearing was filed the next day. On September 20, 2019, the trial court filed a

judgment entry of disposition wherein it adopted the magistrate's findings and recommendations with respect to disposition.

{¶8} On November 21, 2019, ACCSB filed its semi-annual review with the trial court. The review indicated that, at that time, no criminal charges had been filed regarding the physical abuse of M.H. ACCSB indicated it had not received any reports from law enforcement regarding a lack of cooperation from Monica. The review indicated that Monica had been referred to parenting classes and the Choose Your Partner Carefully course, but she had not yet completed either service. Additionally, Monica advised she had contacted a facility that provides mental health services, but had not yet completed a diagnostic assessment. ACCSB indicated that, at the time of the semi-annual review, "Monica has not completed any of the services requested [in] the [c]ase [p]lan." Further, ACCSB detailed its continuing concern for Monica's mental health, ability to understand appropriate parenting, and ability to determine safe and appropriate individuals to be around M.H. As to the child, the semi-annual review indicated Janet had provided for all of M.H.'s basic needs, safety needs, and special needs.

{¶9} Further, the case review indicated that although Monica had full-time employment, her income was not sufficient to meet her needs, and Monica was residing with her mother and younger siblings. ACCSB further indicated that Monica was enjoying supervised visitation with M.H. approximately once a week.

Although ACCSB reported that it did not have concerns regarding Monica's direct care of M.H., the agency continued to have concerns regarding Monica's ability to provide a safe environment.

{¶10} On April 28, 2020, ACCSB filed a motion requesting the trial court modify the disposition of temporary custody of M.H. previously granted to Janet and to place M.H. into Janet's legal custody. ACCSB also requested the trial court approve amended case plan 2.01 and terminate the case. ACCSB indicated the level of risk to M.H. had not been reduced to suggest that it is in M.H.'s best interest to be returned to Monica's care and custody. Further, ACCSB noted that if legal custody was granted to Janet, M.H. could continue to build a relationship and bond with her biological parents and extended family.

{¶11} On May 14, 2020, ACCSB filed its semi-annual review in which it indicated that Monica completed parenting classes and the Choose Your Partner Carefully program. However, Monica has had "sparse contact" with M.H. throughout the case, and ACCSB reported that it had not received information to indicate that Monica's interactions with M.H. improved. The report indicated that Monica obtained her own housing in April 2020. The review also indicated that Monica completed a mental-health assessment in December 2019. Monica scheduled her first counseling appointment for February 2020, but did not show up to the appointment. She rescheduled the appointment for May 5, 2020, but again

failed to show up to the appointment. The mental-health agency contacted ACCSB to inform them Monica's case with the agency was terminated due to non-compliance and that she would need to complete another diagnostic assessment with the agency to re-engage in services. According to the report, Monica did not see a need for her to participate in mental-health counseling. Further, Monica desired for M.H. to be returned to her care and custody. Monica reported that she attends approximately two supervised visitations with M.H. per month, and she advised the visits were "going well."

{¶12} On May 27, 2020, a hearing on the first annual review and ACCSB's motion requesting the trial court modify the disposition of temporary custody and place M.H. into Janet's legal custody was held in front of a magistrate. In a written decision, the magistrate recommended M.H. be placed into the legal custody of Janet. Further, the magistrate found that ACCSB made reasonable efforts to prevent M.H.'s removal from the home and continued removal. The magistrate found the services provided by ACCSB did not prevent removal or enable return because Monica "failed to comply with Case Plan services and has failed to cooperate with the Agency." The magistrate also approved amended case plan 2.01. Accordingly, the magistrate recommended that ACCSB's motion requesting modification of the disposition of temporary custody and placement of M.H. into Janet's legal custody be granted. Finally, the magistrate recommended that all contact and

communication between Monica and M.H. be supervised and arranged at the sole discretion of Janet. The magistrate's decision reflecting its findings and recommendations was filed on June 18, 2020.

{¶13} On June 29, 2020, Monica filed objections to the magistrate's decision. On October 26, 2020, Monica filed her amended objections to the magistrate's decision. On November 9, 2020, ACCSB filed its response to Monica's objections.

{¶14} On November 12, 2020, the trial court filed its judgment entry relating to Monica's objections to the magistrate's decision. The court found by a preponderance of the evidence that M.H.'s best interests would be served by placing the child in the legal custody of Janet. Further, the trial court found that the evidence supported the magistrate's finding that ACCSB made reasonable efforts to allow M.H. to be returned to Monica's home. The trial court did find Monica's objection relating to the exercise of her visitation well-taken and made several modifications to the magistrate's order.

{¶15} On November 23, 2020, the trial court entered its judgment entry adopting the magistrate's decision and related findings of facts and incorporating the amendment to the visitation order reflected in its November 12, 2020 entry reviewing the magistrate's decision.

{¶16} Monica filed her notice of appeal on November 30, 2020. She raises two assignments of error for our review.

**Assignment of Error No. I**

**The trial court's decision is against the manifest weight of the evidence as the Appellee did not prove by a preponderance of the evidence that the minor child should not be reunited with her mother.**

{¶17} In her first assignment of error, Monica argues that the trial court's decision granting legal custody to Janet is against the manifest weight of the evidence because ACCSB did not prove by a preponderance of the evidence that M.H. should not be returned to Monica's custody.[3] Monica further challenges the trial court's determination that granting legal custody of M.H. to Janet is in the child's best interest.

*Standard of Review & Relevant Law*

{¶18} Under R.C. 2151.353(A)(3), if the court adjudicates a child abused, neglected, or dependent, then it may grant legal custody to a parent or other person who requests custody. "'Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact,'

---

[3] We note that ACCSB failed to file a brief in this matter, a practice we strongly discourage. Well-crafted legal briefs and oral arguments are a benefit to the court. Additionally, we caution ACCSB that, under App.R. 18(C), "If an appellee fails to file the appellee's brief within the time provided by this rule, or within the time as extended, the appellee will not be heard at oral argument except by the permission of the court upon a showing of good cause submitted in writing prior to argument; and in determining the appeal, the court may accept the appellant's statement of the facts and issues as correct and reverse the judgement if appellant's brief reasonably appears to sustain such action."

and '[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship.'" *In re J.T.*, 3d Dist. Union No. 14-19-15 and 14-19-16, 2019-Ohio-4520, ¶ 16, quoting *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7. Accordingly, "the award of legal custody is 'not as drastic a remedy as permanent custody.'" *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 32, quoting *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214, ¶ 7. Furthermore, since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7.

{¶19} "In such a case, a parent's right to regain custody is not permanently foreclosed." *In re B.P.*, 3d Dist. Logan Nos. 8-15-07 and 8-15-08, 2015-Ohio-5445, ¶ 19. Thus, unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard the trial court uses in making its determination in a legal custody proceeding is the less restrictive preponderance of the evidence. *Id.* "'"Preponderance of the evidence"' means evidence that is more probable, more persuasive, or of greater probative value." *In re M.G.*, 3d Dist. Allen No. 1-18-54, 2019-Ohio-906, ¶ 7, quoting *In re J.B.* at ¶ 33. "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 14. Consequently, we review a trial court's decision to award a party legal custody of an abused,

neglected, or dependent child for an abuse of discretion, and we afford its decision "the utmost deference." *In re E.W.*, 4th Dist. Washington Nos. 10CA18, 10CA19, and 10CA20, 2011-Ohio-2123, ¶ 18. "The term 'abuse of discretion' connotes more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *In re N.L.*, 3d Dist. Hancock Nos. 5-12-38 and 5-12-39, 2013-Ohio-3983, ¶ 9.

{¶20} In a dispositional hearing involving legal custody, the focus is on the best interest of the child. However, R.C. 2151.353(A)(3) does not list specific factors a court should consider in determining what is in the child's best interest when considering a disposition of legal custody. *In re B.P.* at ¶ 20. However, the factors enumerated in R.C. 2151.414(D) for determining whether a grant of permanent custody is in the child's best interest have been held to be "instructive" regarding an award of legal custody. *In re J.C.*, 3d Dist. Henry No. 7-20-10, 2021-Ohio-1453, ¶ 5. The R.C. 2151.414(D) factors include the interaction of the child with various parties, the custodial history of the child, the wishes of the child as expressed directly by the child or through the GAL, and the child's need for a legally secure placement.

{¶21} Appellate courts apply the criminal standard for reviewing manifest weight challenges in juvenile proceedings. *In re S.L.*, 3d Dist. Logan Nos. 8-17-25, 8-17-26, 8-17-27, 8-17-28, 8-17-29, 8-17-33, 8-17-34, 8-17-35, 8-17-36, and 8-17-

37, 2018-Ohio-1111, ¶ 12. "Under this standard, when reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "'The discretionary powers to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction [or in this case, a granting of legal custody].'" *Id.*, quoting *Martin* at 172. Our role is limited to weighing the evidence introduced at trial and determining whether the state carried its burden of persuasion. *Id.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

*Analysis*

{¶22} Here, the magistrate conducted a hearing on ACCSB's motion to modify temporary legal custody and determined that it was in M.H.'s best interest that Janet be granted legal custody of M.H. Monica objected to the magistrate's decision and the trial court overruled those objections, reasoning as follows:

The Mother's Objections appear to be that the Magistrate failed to give sufficient weight to those pieces of evidence which the Mother asserts to be of importance. There is no indication in the Decision that the evidence cited by the Mother wasn't considered. Rather, it is simply clear from the Decision that other considerations significantly outweighed those highlighted by the Mother.

First the record gives no indication or suggestion from anyone (including the Mother) that [Janet] is not providing more than adequate care for [M.H.]. [M.H.] was found to have suffered significant injuries, including 16 broken bones, all inflicted prior to [her] second birthday. These injuries were found to have been inflicted not in a single horrific incident, but instead were inflicted over an extended period of time. [She] was also significantly developmentally behind when removed from Mother's custody. The consequence of those injuries and circumstances has been that [s]he requires numerous doctor and hospital visits as well as physical, speech, and occupational therapy. [She] continues to suffer from deficits resulting from [her] treatment during the first two years of [her] life while in the custody of [her] Mother. The result is that [she] is now a high needs three year old child who has been in [Janet's] home for the last sixteen months of [her] life and is highly bonded with her. Additionally, [her] adjudication as a dependent and abused child did not relate solely to what appeared to have been multiple incidents of abuse. The adjudication also related to the fact that the multiple injuries identified by [her] medical providers had gone untreated for a period of time. The injuries were found to have been consistent with physical abuse and were found to have been inconsistent with the history given by the Mother. The Mother eventually acknowledged that she had lied about the possible causes of the injuries. Moreover, while the Mother now asserts that her ex-boyfriend was the likely perpetrator, she denies ever observing any such abuse and the actual perpetrator has never been definitively identified.

* * *

The evidence also established that the abuse (whether perpetrated by the Mother or her ex-boyfriend) occurred after the Mother had been involved in a previous court case which had been initiated by the

Board and in which the Child had remained with the Mother under an order of protective supervision. The Mother has been referred for services in both proceedings, including counseling and parent education, and the Choose Your Partner Carefully program. In fact, the Board first initiated the earlier action regarding the Child in early August, 2018 when the Child was less than a year old. The disposition of protective supervision in the earlier case was terminated in March of 2019 and the Board became re-involved through the instant case when the abuse was discovered a little over two months later, on May 30, 2019. The services, training, and education provided in the earlier case notwithstanding, the Child still became the victim of serious abuse and a lack of medical care for her resultant injuries. In summary, there has been essentially constant Board involvement in providing services (with but a 2-3 month interruption) for a period now extending well over two years.

(Doc. No. 103).

{¶23} Monica now renews her argument that the decision of the trial court to grant legal custody of M.H. to Janet was against the manifest weight of the evidence and not in M.H.'s best interest. Specifically, Monica argues she substantially complied with her case plan and argues that the trial court's decision to grant legal custody of M.H. to Janet, a third party, was based solely on "several missed counseling meetings by [Monica] and the fact that the perpetrator of [M.H.'s] injuries was not positively identified." (Appellant's Brief at 10). Monica contends that these reasons were insufficient to award legal custody to Janet. For the reasons that follow, we disagree.

{¶24} First, Monica's characterization of trial court's decision to grant legal custody of M.H. to Janet as based solely on a few missed counseling meetings and

-15-

the fact that the perpetrator of M.H.'s injuries hasn't been identified suggests that Monica lacks a clear understanding of the concerns which led to M.H.'s initial and continued removal from Monica's home.

{¶25} The record reveals that M.H. was removed from Monica's care in May 2019 after medical experts identified 14 fractures in various stages of healing on M.H. (May 27, 2020 Tr. at 8). Based on the injuries, medical experts determined M.H. was the victim of child abuse and that the fractures occurred on at least several occasions over a period of time. (*Id.*). Although medical experts initially identified 14 fractures on M.H., further testing revealed the presence of two additional fractures, bringing the total number to at least 16. (*Id.* at 13). Additionally, M.H. had bruises all over her body, including on her cheeks. (*Id.* at 12). At the time that the injuries were inflicted, M.H. was living with Monica and Joshua, in Joshua's home. (*Id.* at 34).

{¶26} Lawrie Warner ("Warner"), the caseworker assigned to M.H.'s case, testified that during initial interviews with ACCSB and law enforcement, both Monica and Joshua provided explanations for the injuries. (*Id.* at 12). Monica indicated M.H.'s injuries may have occurred by M.H. tripping and falling on the sidewalk or as a result of Monica rolling over on M.H. while they slept. (*Id.*). Joshua suggested he may have accidentally stepped on M.H. when he got up to use the bathroom during the night while M.H. slept on the floor of the bedroom. (*Id.*).

Joshua also indicated the bruises on M.H.'s face may have been the result of him grabbing the child's face while trying to kiss her. (*Id.*). However, Monica and Joshua's explanations for the injuries were rejected by the medical experts as implausible. (*Id.*).

{¶27} Furthermore, both Monica and Joshua admitted that they were not completely honest with law enforcement and the initial investigator from ACCSB. (May 27, 2020 Tr. at 12, 35-36, 72). Specifically, Monica admitted that although she initially stated that she was present when M.H.'s injuries occurred, she later said she was not present when M.H.'s injuries occurred and did not know how the injuries occurred. (*Id.* at 35). Monica testified she initially lied to the police because she "knew CPS would get involved" and she was "scared of CPS." (*Id.* at 72). At the legal custody hearing, Monica again denied causing the injuries to M.H., but testified that, "in retrospect," Joshua could have caused the injuries. (*Id.* at 62).

{¶28} Warner testified that one of the case plan requirements was that Monica cooperate with ACCSB and law enforcement in an effort to determine how the injuries occurred. (*Id.* at 11). According to Warner, despite Monica's admitted dishonesty during her initial interview with law enforcement and a representative of ACCSB, Monica cooperated with law enforcement and ACCSB during their investigation into the injuries, including participating in multiple subsequent interviews. (*Id.* at 35, 38-39). However, Warner stated that, at the time of the legal

custody hearing, no formal charges or arrests had been made with respect to M.H.'s injuries. (*Id.* at 13).

{¶29} Warner clarified ACCSB's initial and ongoing concern was that M.H. suffered approximately 16 different injuries before she was two-years-old, and while she was living with two adult caregivers. (*Id.* at 34-35). Furthermore, the explanations that the caregivers provided regarding M.H.'s injuries did not account for the injuries. (*Id.*). Warner stated that ACCSB was concerned that Monica and Joshua, were caring for M.H. during the period of time in which the injuries occurred and investigators were unable to ascertain who caused the injuries or whether either adult even realized the child had been harmed. (*Id.* at 35).

{¶30} Further, Warner stated that in 2018, ACCSB initiated a protective supervision case due to concerns of domestic violence within M.H.'s household, including concerns with Monica's selection of caregivers. (May 27, 2020 Tr. at 16-17). According to Monica, the case plan services put in place as part of the current case, aside from cooperating with law enforcement, were a mirror image of the case plan she worked during the 2018 protective supervision case. (*Id.* at 17, 19). According to Warner, the protective supervision case ACCSB initiated in 2018 was terminated because Monica successfully completed her services in 2019. (*Id.* at 19). However, despite the services Monica previously received, M.H. still sustained 16 fractures while in Monica's custody. (*Id.*).

{¶31} As part of the case plan services for both the current case and the 2018 case, Monica was required to complete the Choose Your Partner Carefully program. (*Id.* at 16-17). Monica admitted during her testimony that, in the past, she has not chosen wisely with regard to her romantic partners. (*Id.* at 65-66). Warner described the Choose Your Partner Carefully program as a course which gives participants tools to research individuals they are considering allowing around themselves and their children, such as prospective romantic partners. (*Id.* at 17). The course gives tips regarding conducting background checks to determine whether an individual has a criminal or violent history. (*Id.* at 18). According to Monica, she "thinks" she completed the Choose Your Partner Carefully class when completing the 2018 case plan. (*Id.* at 65). However, Monica admittedly did not complete the Choose Your Partner Carefully course during the current case plan. Importantly, Warner testified that, if Monica had utilized the skills taught during the Choose Your Partner Carefully course, she would have noticed some red flags with regard to Joshua's history. (*Id.* at 18-19). Monica stated she noticed several red flags leading up to M.H.'s injuries, including the way that Joshua interacted with his own son. (*Id.* at 70). Nonetheless, she utilized Joshua as her babysitter when she was at work. (*Id.* at 71). Monica admitted she should have looked into Joshua's background more carefully before becoming romantically involved with him, but stated she "just wasn't thinking at the time." (*Id.* at 67). Accordingly, even if

Monica took the Choose Your Partner Carefully course as part of her 2018 supervision case, she still failed to utilize skills she learned therein when deciding to become involved with Joshua. Thus, it appears she did not retain or apply the information she learned in the course. Nonetheless, she chose not to complete the course during her work on the present case plan, despite the caseworker giving her at least three referrals for the course. This choice demonstrates a lack of diligence on Monica's behalf and also indicates that she does not have the tools to protect herself and her daughter from individuals that pose harm. This is particularly troublesome due to M.H.'s young age and developmental delays.

{¶32} Monica contends that because she ended her abusive relationships with both Malachai and Joshua, she removed the concern that led to ACCSB's involvement. (*Id.* at 65-66, 73). While these past relationships were terminated, Warner testified, Monica, nevertheless, continued to find herself in situations where she and M.H. were in danger. (*Id.* at 24). According to Warner, concerns over Monica's past abusive relationships and history of abuse and neglect as a child made the mental health component of the case plan "of the utmost importance." (*Id.* at 36). In fact, Monica, admitted that representatives from ACCSB were clear with her from the beginning of her current case that they wanted her to receive any needed mental health services. (*Id.* at 73).

{¶33} However, Monica admitted that, due to delays on her part, she did not complete her mental health assessment until December 6, 2019. (May 27, 2020 Tr. at 19-20, 73). Warner testified that on January 9, 2020, she received a letter from the mental health counselor that indicated that Monica did not meet the criteria for further services. (*Id.* at 20). However, approximately one month later, the counseling center reassessed and contacted Monica to inform her that it recommended individual counseling for Monica based on her history as a victim of domestic violence. (*Id.* at 20). Although Monica was scheduled for her first counseling appointment on February 11, 2020, she did not show up for the appointment. (*Id.*). A make-up appointment was then scheduled for May 5, 2020; however, Monica also failed to attend that appointment. (*Id.* at 21.) Eventually, Warner received a notice from the counseling center that, due to Monica's non-compliance and lack of attendance, it had "closed out" Monica's services. (*Id.*). In fact, Monica did not complete a single counseling session until the day before the legal custody hearing, when she completed her first counseling session via telephone. (*Id.* at 63). At the hearing, Monica admitted she missed both of the previous counseling sessions. (*Id.* at 63-64). Monica claimed she missed the first counseling appointment because she was at work. (*Id.* at 64). She admitted that she missed the second counseling appointment but stated she "forgot why" and "just [doesn't] think [she] could make it." (*Id.*).

**{¶34}** Warner testified that Monica's lack of compliance with mental-health counseling was particularly problematic because Monica's case plan services were established to give Monica an opportunity to strengthen her parenting skills and examine why she continues to find herself in situations where she and M.H. are in danger. (*Id.* at 24). Warner stated that without Monica's compliance with the mental-health component of her case plan, Monica "has not put a dent in the immediate safety threat that would be posed to M.H." if she was returned Monica's care. (*Id.* at 25).

**{¶35}** Further, the testimony presented at trial indicated Monica's interest in exercising visitation with M.H. waned over the course of the case. Warner testified that immediately following M.H.'s removal from Monica's home, M.H. was placed in foster care for approximately six weeks. (*Id.* at 8). However, ACCSB identified Janet, M.H.'s paternal great-aunt as a suitable relative placement in July 2019, and M.H. has been in Janet's care since that time. (*Id.*). Warner testified that Janet was willing to host Monica's supervised visitations in her home and serve as the visitation monitor. (*Id.* at 14). Warner and Janet both testified that from the beginning of the case, Janet has had an "open door policy" with Monica and was willing to facilitate multiple visits with M.H. and Monica throughout the week. (*Id.*). Warner testified that initially, the agency tried to set up approximately three supervised weekly visits between Monica and M.H. (*Id.*).

{¶36} However, Janet testified that Monica's contact with M.H. has been "getting less and less" over the last five months. (May 27, 2020 Tr. at 53). Warner testified Monica told her she was seeing M.H. approximately twice a month. (*Id.* at 14-15). However, Janet testified that Monica texts Janet approximately once a week to inquire on M.H. (*Id.* at 53). Janet stated the reason for the decreased contact between Monica and M.H. is that Monica would often cancel her scheduled visits with M.H. (*Id.*).

{¶37} Further, Janet testified that when Monica does visit with M.H., the child's interactions with Monica are "[n]ot very good." (*Id.* at 54). Janet stated that, initially, M.H. would "cling" to Janet and not allow Janet to leave her side for the entire visit. (*Id.*). Janet also recalled incidents where M.H. would pinch, bite, and hit Monica. (*Id.*). Janet stated that eventually M.H.'s physical outbursts toward Monica improved; however, M.H. kept running back to Janet and away from Monica. (*Id.*). In contrast, Warner observed Janet and M.H.'s interactions and stated that M.H. and Janet have a great bond and relationship. (*Id.* at 26-28).

{¶38} Moreover, M.H. has a number of physical and developmental special needs being addressed by Janet. Warner and Janet testified that M.H. has continuing medical concerns resulting from the fractures which require a variety of follow-up appointments. Janet stated that when M.H. came into her care, her fractures were in different stages of healing. (*Id.* at 51). Accordingly, Janet took M.H. to

Nationwide Children's Hospital in Columbus for follow-up appointments approximately 15 times and continues to take her to out-of-town specialist appointments. (*Id.*). Janet stated that M.H.'s medical team was attempting to determine if she will have long-term effects from her fractures, and that M.H. exhibits physical symptoms requiring additional treatment and follow up as the medical team attempts to give M.H. the best medical care possible. (*Id.* at 51-52).

{¶39} Additionally, M.H. is developmentally delayed and receives weekly physical therapy, occupation therapy, and early intervention therapy. (May 27, 2020 Tr. at 30-31, 52). Janet described M.H. as being "really * * * delayed" and stated that, in addition to the physical, occupation, and early intervention therapy, M.H. is working with a specialist at Dayton Children's Hospital to attempt to determine the cause. (*Id.* at 52). According to Warner and Janet, M.H. is starting to achieve developmental milestones; however, she has a long way to go in her therapies. (*Id.* at 53). Janet and Warner both testified that Janet is meeting M.H.'s physical and special needs and that Janet has been responsible for getting M.H. to all of her therapy and medical appointments for the entire time that M.H. has been in Janet's care. (*Id.* at 30-31, 55-57).

{¶40} Warner testified that she believes it is in M.H.'s best interest for the trial court to grant legal custody of M.H. to Janet. (*Id.* at 29). In support of her opinion, Warner stated that M.H. is still physically vulnerable due to her age, her

history of abuse, and her developmental delays. (*Id.*). Additionally, due to speech delays, M.H. is unable to verbalize if she were to be victimized by additional abuse or neglect. (*Id.* at 29-30). Accordingly, M.H. is "completely dependent" on her caregivers to provide a safe and stable environment free from hazards or persons that would pose a threat. (*Id.* at 30). Warner testified that Janet has consistently demonstrated her ability to keep M.H. safe and to provide for all of her basic, medical, and special needs. (*Id.*). The GAL also testified that she believed it was in M.H.'s best interest for the trial court to grant Janet legal custody of M.H. due to the GAL's concerns relating to Monica's "protective capacities." (*Id.* at 76-77).

{¶41} Based on the evidence presented, we do not find the trial court abused its discretion by finding by a preponderance of the evidence that legal custody of M.H. should be awarded to Janet.

{¶42} Accordingly, Monica's first assignment of error is overruled.

### Assignment of Error No. II

**The trial court committed prejudicial error in finding that the Allen County Children Services Board made reasonable efforts to return the child to the custody of the Appellant.**

{¶43} In her second assignment of error, Monica argues that the trial court abused its discretion in granting legal custody of M.H. to Janet because, according to Monica, the record does not support the trial court's conclusion that ACCSB

made reasonable efforts to prevent the continued removal of M.H. from Monica's home.

*Standard of Review & Applicable Law*

**{¶44}** R.C. 2151.419 imposes a duty on the part of children services agencies to make reasonable efforts "'to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.'" *In re B.P.*, 2015-Ohio-5445, at ¶ 39, quoting R.C. 2151.419(A)(1). "[T]he agency bears the burden of showing that it made reasonable efforts." *In re T.S.*, 3d Dist. Mercer Nos. 10-14-13, 10-14-14, and 10-14-15, 2015-Ohio-1184, ¶ 26, citing R.C. 2151.419(A)(1). "We review under an abuse-of-discretion standard a trial court's finding that an agency made reasonable efforts toward reunification." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 24, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 48 and *In re Sherman*, 3d Dist. Hancock Nos. 5-06-21, 5-06-22, and 5-06-23, 2006-Ohio-6485, ¶ 11.

**{¶45}** "'Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated.'" *In re T.S.* at ¶ 26, quoting *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 WL 1333979, *3 (Oct. 30, 2001). "To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to

achieve reunification." *Id.* at ¶ 27, citing *In re Evans* at *3. "Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan." *Id.*, citing *In re Evans* at *3. "'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.'" *Id.*, quoting *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 10. ""'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47. "We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount." *In re T.S.* at ¶ 27, citing 2151.419(A)(1).

*Analysis*

{¶46} In its judgment entry overruling Monica's objections to the magistrate's decision, the trial court reasoned as follows:

> The evidence also supports the Magistrate's finding that the Board has made reasonable efforts to allow the Child to be returned to the home of the Mother. These efforts have included all of those services afforded under the earlier protective supervision proceeding, and have included referral for parent education, the Choose Your Partner Carefully program, referral to Coleman Professional Services for

-27-

> mental health counseling, case management, and general counseling. These efforts were unsuccessful because the Child still suffered significant abuse after the referral of the mother for services in the earlier proceeding, and because the Mother failed to timely avail herself of the counseling offered at Coleman Professional Services.

(Doc. No. 103).

**{¶47}** Monica's argument in support of her assignment of error centers around her contention that she substantially complied with her case plan objectives. Thus, Monica argues that as a result of her substantial compliance with her case plan, the trial court erred by determining that ACCSB made reasonable efforts to unify her with her daughter. We disagree.

**{¶48}** First, although Monica argues that she substantially complied with her case plan, for the reasons outlined in our discussion of Monica's first assignment of error, we find that the trial court did not err by determining that Monica did not comply with her case plan. Notably, despite her caseworker's discussion of the importance of mental health counseling to address the underlying issues leading to M.H.'s removal from her care, Monica displayed reluctance to schedule her initial assessment. (May 27, 2020 Tr. at 19-20, 37, 45-46, 73). Additionally, Monica failed to attend her first two scheduled counseling sessions. (*Id.* at 20-21, 37-38, 63-64). In fact, at the time of the final hearing, Monica had completed only one mental health counseling session, which she attended the day before the final hearing. (*Id.* at 63-64). Accordingly, ACCSB's concerns regarding Monica's

-28-

mental health and ability to understand healthy relationships and warning signs in others were not adequately addressed by Monica's actions.

**{¶49}** Next, although Monica suggests that ACCSB did not make reasonable efforts to reunite her with M.H. because her visits did not progress from supervised visitations to non-supervised visitations, the evidence adduced at the hearing supports a finding that it was Monica's lack of diligence with the case plan that hindered her progression to unsupervised visitations with her daughter. As indicated in the discussion of Monica's first assignment of error, despite Janet's willingness to supervise three visitations between Monica and M.H. a week, Monica contacted Janet with decreased frequency to set up visitations or to check-in on M.H.'s well-being. (*Id.* at 14-15, 53-54).

**{¶50}** Finally, as stated in our discussion of the first assignment of error, Monica fails to grasp that her inability to safeguard M.H. against harm and provide a safe and stable home, along with her other deficiencies under the case plan are the reasons she did not progress to unsupervised visitation. Monica was not capable of safely parenting M.H. in an unsupervised setting and ACCSB's decision not to allow unsupervised visitation do not amount to a failure to make reasonable efforts to prevent the continued removal of M.H. from Monica's home. *In re A.W.*, 3d Dist. Shelby No. 17-15-15, 2016-Ohio-750, ¶ 23.

{¶51} In addition, although Monica completed a similar case plan prior to ACCSB's current involvement, Monica continued to show poor judgment through her inability to demonstrate some of the skills she had been taught in the classes that were provided by ACCSB, such as examining the background of individuals in her life, particularly potential romantic partners, to see who was appropriate to have around her daughter. Although Monica admitted she should have done a more thorough job of looking into her former boyfriend's background prior to allowing him to have unsupervised access to M.H., Monica failed to recognize the "red flags" that he was not a safe person for M.H. to be around. Yet, Monica did not care enough to complete the Choose Your Partner Carefully course for a second time and did not timely pursue the required mental health counseling that was designed to help her make safe choices for her and M.H. in the future.

{¶52} ACCSB employed numerous services and we do not find that ACCSB's efforts were less than reasonable. *In re A.C.*, 3d Dist. Allen No. 1-19-20, 1-19-21, and 1-19-22, 2020-Ohio-980, ¶ 73, citing *In re H.M.K.*, 2013-Ohio-4317, at ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. As the law states, ACCSB was not required to engage in all efforts, rather, reasonable efforts. *In re J.B.*, 2016-Ohio-2670, at ¶ 44. Based on the record before us, we do not find that the trial court erred in determining that reasonable efforts were exercised in this case. The trial court's conclusion that ACCSB made

reasonable efforts to prevent the continued removal of M.H. from Monica's home was not unreasonable, arbitrary, or unconscionable.

**{¶53}** Accordingly, Monica's second assignment of error is overruled.

**{¶54}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas, Juvenile Division.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**